## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

ROSALIE FALLIS,

        Plaintiff,

v.                                                            No. CIV 04-698 LFG

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Rosalie Fallis ("Fallis") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Fallis was not eligible for disability benefits. Fallis moves this Court for an order reversing the Commissioner's final decision, or alternatively, to remand for a rehearing. [Doc. No. 6.]

Fallis was born on December 14, 1940 and was 62 years old when the administrative hearing was held. [Tr. at 40.] She has a high school education, worked in a law office years ago and began taking some college courses. [Tr. at 156.] She raised ten children from 1964 through 1979. Fallis' past relevant work experience is as a home health care worker. [Tr. at 90.]

On May 16, 2002, Fallis applied for disability benefits, alleging an onset date of September 8, 1998 due to a broken left hip and surgery for the fracture. [Tr. at 12, 94, 108, 112.]

1

Fallis' application for disability benefits was denied at the initial and reconsideration stages, and she sought timely review from the Administrative Law Judge ("ALJ"). An administrative hearing was held on June 19, 2003 in Roswell, New Mexico. [Tr. at 142.] Fallis was represented by a non-attorney. In a decision, dated March 4, 2004, ALJ Gerald Cole found that Fallis was not disabled within the meaning of the Social Security Act ("the Act") and denied the benefit request. Fallis challenged this determination to the Appeals Council which denied her request for review on April 30, 2004. [Tr. at 4.] This appeal followed.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[1] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five. If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[2]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[3] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits [her] physical or mental ability to do basic work activities . . . .,"[4] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App.

---

[1] 20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[2] 20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[3] 20 C.F.R. § 404.1520(b) (1999).

[4] 20 C.F.R. § 404.1520(c) (1999).

1 (1999);[5] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[6] If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[7] age, education and past work experience, she is capable of performing other work.[8] If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[9] Here, Judge Cole made the determination at step two of the sequential process, concluding that Fallis did not satisfy her burden of showing that she suffered from a severe impairment that lasted or could be expected to last for a continuous period of at least 12 months. [Tr. at 11, 15-16.]

## Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994). To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992); Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). The Court's review of the

---

[5] 20 C.F.R. § 404.1520(d) (1999). If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent [her] from doing any gainful activity." 20 C.F.R. § 416.925 (1999).

[6] 20 C.F.R. § 404.1520(e) (1999).

[7] One's RFC is "what you can still do despite your limitations." 20 C.F.R. § 404.1545(a). The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy. Those categories are: sedentary, light, medium, heavy and very heavy. 20 C.F.R. § 405.1567 (1999).

[8] 20 C.F.R. § 404.1520(f) (1999).

[9] Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

Commissioner's determination is limited.  Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied.  Id. at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.  The Court cannot re-weigh the evidence or substitute its judgment for that of the Commissioner.  Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

After carefully and thoroughly evaluating Fallis' medical records, symptoms and complaints, the ALJ rejected Fallis' claim for benefits at step two, concluding that Fallis failed to meet her burden of proving that she had any "severe" impairments.  [Tr. at 15.]  The ALJ further stated there was no credible evidence that Fallis had significant functional limitations for any consecutive 12-month period at issue.  [Tr. at 15.]  In reaching this decision, Judge Cole found that: (1) Fallis had not engaged in substantial gainful activity since her alleged onset of disability; and (2) Fallis had "medically determinable" impairment(s) as described in his opinion; (3) but that Fallis did not have any impairment(s) that significantly limited her ability to perform basic work-related activities.  [Tr. at

16.]  Thus, Judge Cole concluded that Fallis did not have a "severe" impairment" and was not under

a "disability" as defined by the Act.  [Tr. at 16.]

    In this appeal, Fallis argues that the ALJ's decision was not supported by substantial evidence.

More specifically she contends that the ALJ committed error in his (step four) evaluation of Fallis'

ability to perform her past relevant work and error in failing to properly consider Fallis' age.  The

Commissioner claims that Fallis' attorney wrongly argued the case as the ALJ did not reach step four

of the sequential process, and in any event that the ALJ's decision was properly supported by

substantial evidence in the record.

**<u>Summary of Fallis' Medical Condition</u>**

    Fallis' few medical records begin in 1998 when she broke her left hip.  Fallis was 57 years old

at the time.  [Tr. at 93.]  In September 1998, Fallis was involved in an altercation and was thrown to

the ground.  The altercation resulted in a left hip fracture.  [Tr. at 12, 112.]  She was taken to the

Emergency Room of the Plains Regional Medical Center in Clovis, New Mexico.  Fallis denied any

pain except to the areas of her left hip and thigh area.  [Tr. at 112.]  Dr. Hensal performed surgery

on Fallis' hip on September 9, 1998.  He inserted a threaded compression nail and a plate with four

screws in the left hip.  [Tr. at 108.]  Dr. Hensal noted in his report that the surgery left Fallis with

"virtually perfect anatomic alignment and positioning."  Fallis was discharged on September 14, 1998.

The discharge notes indicate that Fallis began physical therapy on the second post-operative day.  Her

ambulation gradually advanced over the next few days.  A September 14 x-ray showed some

impaction of fracture fragments which was felt to be desirable.  The physical therapist said that Fallis

was essentially independent in transfers and gait.  Fallis was given prescriptions for a walker and pain

medications. A follow-up appointment was made for September 21, 1998, but there are no further medical records that Fallis appeared for that appointment. [Tr. at 93.]

On May 16, 2002, Fallis applied for disability benefits. [Tr. at 41.] On one disability report, the social security interviewer noted that Fallis walked but was poorly balanced. "She's drifty, flighty very likeable. Tall large woman. Neat; can't seem to concentrate on basics. Hard to get information from her about her work. Artistic. 10 kids wow!" [Tr. at 49.]

On Fallis' disability benefit application she stated that she did not work from 1978 through 1981, 1983, 1985 through 1988, and 1990 through 1992. In 1995, she worked part time. In 1997, she worked fewer hours. In 1998, she stopped working and has not worked since. [Tr. at 41.] Fallis' work history report indicates that she worked with home health care for elders from 1995 to 1998. She also assisted with painting and ran errands. She lifted 25 to 40 pounds at times. The form does not contain much information. [Tr. at 53.] On another disability form, Fallis stated that she worked with the elderly from 1996 to June 1998, and that she did some painting jobs from 1993 to 1995. She and her husband had a paint contracting business from 1979. [Tr. at 91.]

On a disability report dated May 16, 2002, Fallis wrote that could not work due to "whiplash." She also stated that since breaking her left hip, her right side was strained and she could not lift or carry weight. She had had a broken rib. Fallis noted that after her hip surgery in 1998, she was unable to draw unemployment because of her broken femur/hip that required insertion of a metal plate and screws. She indicated that some of her past work included assisting an 85-year-old man and that she had to carry him to the bathroom, bed and the car. She lifted 100 pounds at times. The form does not show that Fallis was taking any medications. [Tr. at 61-67.]

On Fallis' daily activities questionnaire, she described her day as getting up early, showering and tying up her hair. She was not able to tie her shoes for "a long time." She suffered injuries to her neck and hip that hindered her ability to carry children or elderly persons. The 15-16 steps on the stairs in her house had been Fallis' source of exercise. Fallis' husband did most of the cooking and errands. She had been able to drive but each time she did, Fallis felt it set her back one to two days. Her children took turns in assisting her and driving her. Fallis had some trouble getting in and out of cars. She used a stick and tables to brace herself. Fallis described herself as practically a "hermit." On this form, Fallis also indicated that she and her husband ground their own whole wheat for pancakes and that her husband did most of the cooking. She fixed breakfast about two times per month. She tended to forget what she was doing and to burn things. Fallis was able to do very little household work and it was difficult to remove clothes from the dryer. She was able to vacuum some and water the flowers.

Fallis' hobbies were webtv, some sewing and grinding wheat. She had tried camping but had had a "bad spell." Fallis could not bend over without pain in both hips and her neck. She reported physical imbalance and that her concentration was erratic. She watched the news and movies and listened to PBS. Fallis visited with friends and relatives when they dropped in. She had tried swimming in February but it was "too much." Fallis stated that she had no emotional problems to the degree that she could not manage. She could type, use a keyboard, and dress herself. Fallis tended to fatigue easily. [Tr. at 71-76.]

With respect to recent medical treatment that Fallis received, she stated that her surgeon told her the only relief he could give her at this point was to operate and remove the plate and screws from

her hip.  However, according to Fallis, he could not guarantee that her sciatic [sic] would be helped. There are no corresponding medical records documenting this conversation.  [Tr. at 89.]

On September 17, 2002, Fallis attended a consultative examination performed by Dr. Syed Mahdi.  [Tr. at 114.]  Fallis complained of cramps and "charlie horses" in her lower legs on and off since her 1998 surgery.  The pain was worse or was precipitated by lifting heavy objects, pulling weeds from the garden and/or when bending on her knees.  She did not take medications.  Fallis told Dr. Mahdi that her surgeon had offered to remove the nails [screws] but Fallis declined.  She felt, however, like the nail [screw] was sticking out in the lower part of her left thigh.  Fallis stated that she was able to climb stairs in her home and could do the laundry and weeding.  She used to help her husband with the bookkeeping for his paint contracting business.  Fallis reported that she had suffered a whiplash injury in December 2001.  Dr. Mahdi observed that Fallis walked into the exam room without assistive devices and was able to get on and off the exam table without problems.  Fallis' gait was good without the use of any cane or assistive device.  Her coordination was grossly intact.  [Tr. at 114.]

Dr. Mahdi filled out a medical source statement regarding Fallis' ability to do work related activities and indicated that she had no restrictions.  [Tr. at 117.]

In October 2002, after the Social Security Administration denied Fallis' request for reconsideration of its prior denial of benefits, Fallis again noted that she had suffered a whiplash five years ago when she was in a rear-end collision in December 1997.  Then a few months later, she said she was "front ended."  Fallis had some chiropractic adjustments done.  She stated that she had a rib broken in 1992 and again in April 2002.  She described the 1998 incident when she fractured her hip as being thrown to the ground after having been pulled by her hair, at which time she re-injured her

8

neck, ribs and femur.  The healing took over two years.  Fallis noted that her spine was out of alignment and her shoulders ached all of the time.  Her neck "locked" to the left many times each day and she could not comb her hair.  She suffered extreme pain from her neck to the top of her head.  In February 2002, she tried water aerobics but felt the attempt had further injured her neck and back.  [Tr. at 81.]

Fallis' administrative hearing was held on June 19, 2003.  [Tr. at 142.]  She testified that she lived at home with her husband and that neither worked.  Fallis' husband was disabled from a lower back injury (but was able to take care of his and his wife's personal needs).  He received a social security check in the amount of $1005 each month and Fallis received $263 monthly from social security.  Fallis stated that her injury/surgery caused her quite a bit of uncomfortable pain and that she returned to her surgeon several times for approximately six months.  However, there are no medical records documenting these doctor visits subsequent to the surgery.  Fallis acknowledged that she had not been to any other doctors in the last four years.  She had not seen her primary care doctor in ten years even though she had attempted to make appointments.  Fallis got massages and oxygen therapy from her two daughters in Clovis, but not frequently.  She acknowledged there were no medical records describing these treatments.

In describing her day, Fallis stated that she typically rose at 5-6 each morning and would then lie down at about 6 p.m.  She was sleeping better than before.  Her knee "popped some" and she had continual "charlie horses" from her knee to her hip if she stood at the sink for any period of time.  Fallis was able to start the coffee brewing and sit down at the computer.  She could turn on the water to cook beans, feed the baby chickens and run a few errands.  She used webtv and watched television.  Fallis described herself as never really being a housekeeper and stated she could not vacuum very

9

much.  She did a little laundry but it was painful to bend.  Fallis sat on the porch and rocked in a rocking chair.

Fallis graduated from high school and stated that she worked in a law office for seven years. After raising her 10 children, she tried to go back to college a few times but could not do it.  She stated that she was barely able to take care of herself and that nobody would hire her part-time.  Fallis testified that "I was definitely disabled totally for at least a year because I was on a walker, wheelchair and everything trying to get this thing to work."  [Tr. at 142-158.]

Fallis' representative asked her a few questions about injuries to her bones.  Fallis testified that when she was working for an older person, she was rear-ended and suffered a whiplash.  [Tr. at 159.] She was not seen for this injury, and there are no medical records documenting the condition.  Fallis again said that later someone front-ended her and she again suffered whiplash.  She thought the whiplashes occurred in 1998 and 1999.  [Tr. at 160.]  Fallis had not had normal movement in her neck since then.  In September 1998, Fallis stated that she was attacked by a woman she did not know when Fallis was taking a car seat to her daughter.  As she approached her daughter's house, Fallis encountered an elderly woman being chased by another woman, and it appears that Fallis entered into the dispute.  Fallis stated that she was dependent on a wheelchair for two years after her hip fracture and surgery.  [Tr. at 162.]  She states, however, that now she could walk around the block on her own.  She tended to feel pain after standing for an hour or two.  She could drive.  [Tr. at 164.]  Fallis started swimming therapy on her own initiative.  At the hearing, Fallis' representative questioned whether there were any outstanding medical records, and Fallis stated that the ALJ had everything. [Tr. at 165.]

The ALJ ordered an orthopedic exam because he was not satisfied with the medical evidence he had at that point.  [Tr. at 166.]  An x-ray taken September 25, 2003, with views of both hips showed no degenerative changes.  Fallis had a normal right hip and an old healed left hip fracture. [Tr. at 141.]

On October 2, 2003, Dr. N. Alexander examined Fallis for lower back pain.  Dr. Alexander is a board certified pain management-wound care specialist.  Fallis complained to him of lower back pain going down her legs for the last five years.  She said she was beaten up and thrown to the ground in 1998.  Fallis reported, however, that she had been doing fine with no pain over the last two weeks. She still had numbness on the sole of her left foot, lateral leg and thigh with some cold feelings.  Fallis reported that her pain was constant with sharp intermittent episodes going down her left leg to the ankle.  She had muscle cramps and could not sit for any period of time.  She had been sleeping on the floor for two weeks.

In his report, Dr. Alexander stated that "I would like to emphasize today she has no pain and has not had pain for two weeks."  Fallis had "good gait, balance and proprioception."  She was able to bend and stoop, and walk on her heels and toes.  Dr. Alexander described Fallis as overweight and a difficult historian.  He had very little objective information supporting her claims, but had reviewed the x-ray of her hip showing a healed inter-trochanteric fracture.  Dr. Alexander asked Fallis if she wanted to schedule some appointments based on her subjective complaint that she had not been doing well for five years.  Apparently, Fallis stated she would do that, but there are no records indicating that she ever did.

Like Dr. Mahdi, Dr. Alexander also filled out a medical source treatment form indicating that Fallis had no work-related restrictions.  [Tr. at 134-40.]

11

On March 3, 2004, Judge Cole issued his written decision denying benefits to Fallis.  [Tr. at 8-16.]  The ALJ noted that Fallis was a 63-year old individual "closely approaching retirement age." [Tr. at 11.]  Judge Cole carefully reviewed the entire record, along with the few medical records that existed.  He then fully discussed both consultative exams, including Dr. Mahdi's diagnosis that Fallis suffered a history of whiplash with degenerative joint disease of her neck.  The ALJ thoroughly explained why he did not concur with part of Dr. Mahdi's diagnosis and also why the ALJ's lack of concurrence was insignificant in light of Dr. Mahdi's other conclusions.  [Tr. at 13.]

Judge Cole ultimately concluded that Fallis had not satisfied her burden in demonstrating that she had a "severe" impairment at step two of the sequential evaluation.  Thus, he denied her request for benefits.  [Tr. at 15.]

## Discussion

## STEP 2 FINDINGS

At step two of the sequential evaluation process, the decision maker decides whether the claimant "has a medically severe impairment or combination of impairments."  Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).  Plaintiff bears the burden to present medical evidence of a severe impairment.  Id. at 751.  "A severe impairment is one that interferes with basic work activities."  Roberts v. Callahan, 971 F. Supp. 498, 500 (D.N.M. 1997).  An impairment is not severe "if it does not significantly limit your physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a).  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs," including walking, standing, sitting, lifting, hearing, seeing, speaking, understanding, carrying out simple instructions, use of judgment, responding appropriately to supervision and co-workers, and dealing with changes in a routine work setting.  20 C.F.R. § 404.1521(b)(1-6).  An impairment

is not severe if it is only a slight abnormality with a minimal effect on the ability to work.  Roberts,

971 F. Supp. at 500 (*citing* SSR 85-28).

> Presumptively, if the medical severity of a claimant's impairments is so slight that the impairments could not interfere with or have a serious impact on the claimant's ability to do basic work activities, irrespective of vocational factors, the impairments do not prevent the claimant from engaging in a substantial gainful activity. If the claimant is unable to show that his impairments would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits.  If, on the other hand, the claimant presents medical evidence and makes the *de minimis* showing of medical severity, the decision maker proceeds to step three.

Williams, at 751 (*citing* Bowen v. Yuckert, 482 U.S. 137, 140 (1987)).

The Court recognizes that the step two showing of severity is a *de minimis* showing.  Yet,

the Court concludes that substantial evidence supports the ALJ's determination that Fallis failed to

meet even the *de minimis* showing.

Here, after a thorough review of the medical records and Fallis' disability materials and

testimony, Judge Cole found that Fallis had no significant functional limitations.  The medical records

are consistent with such a finding, each of which was discussed by the ALJ.  A few days after hip

surgery, physical therapists reported that Fallis was "essentially" independent in her transfers and gait.

She was prescribed a walker only, along with some pain medications.  Fallis was to return for a

follow-up appointment with the surgeon but there is no medical evidence that she attended the

appointment.  Indeed, there are no medical records indicating Fallis visited any doctor after she was

released from the hospital in 1998.

In September 2002, the consultative physician noted that Fallis' physical examination was

essentially normal and that her gait was good without the use of a cane or any other assistive device.

While Fallis reported she had pain, she did not have "daily" pain.  Moreover, she was not taking any

13

medications at that time and was able to climb 16 stairs in her house regularly and do other household tasks.

The consultative physician recorded that Fallis sustained a whiplash injury in December 2001 (although Fallis testified that the two whiplash injuries occurred in various years--1997, 1998, 1999, and 2001).  However, Dr. Mahdi also found from a clinical perspective that her neck was normal. Fallis had slightly decreased motion of her thoracic spine and was diagnosed a history of whiplash with degenerative joint disease of her neck.  Nonetheless, as noted by the ALJ, the consultative physician documented that Fallis did not have any work-related restrictions from any type of medical condition.

The September 2003 x-ray of Fallis' hips were interpreted as normal.  Dr. Alexander, a pain specialist, conducted another consultative examination.  At that time, Fallis stated she had not had any pain for two weeks and was feeling fine.  Dr. Alexander also found that Fallis had a good gait and balance.  He observed that Fallis was able to bend, stoop and walk on her heels and toes.  While Fallis had a probable lumbar strain, from an "objective" perspective, she had "very little at all" (apparently referring to dysfunction, pain or strain).  Fallis agreed to more appointments with Dr. Alexander, but again there are no records to support she followed up by scheduling and/or attending more appointments.

The ALJ also assessed what Fallis stated she was able to do on a typical day.  Judge Cole had serious doubts of Fallis' alleged chronic pain in view of the medical evidence, Fallis' failure to follow up with medical care and her report that she does not take any medication for allegedly severe pain. Moreover, the ALJ noted that Fallis was able to sit for long periods, despite her alleged pain, when

14

she used the Internet and webtv and sat in the rocking chair.  Finally, no doctor placed any work-related restrictions on Fallis.

The Court concludes that substantial evidence in the objective medical record supports the ALJ's conclusion that Fallis' physical problems only minimally affected her ability to work and that the ALJ committed no error in reaching his conclusion.

With respect to Fallis' contentions in her opening and reply briefs, the Court agrees with Defendant that Plaintiff's counsel's argument misses the mark.  For example, Fallis argues that the ALJ was required to perform a complete evaluation of Fallis' past relevant work and to compare the requirements of her prior work with her functional limitations "as a condition to any step four disposition." [Fallis' opening brief, p. 2.]  However, the ALJ did not reach step four of the sequential evaluation.   He denied Fallis' request for benefits at step two and was not required, therefore, to continue through the sequential process.  In essence, Fallis' attorney mistakenly asserts that the ALJ should have proceeded through the entire evaluation process.  20 C.F.R. § 404.1520(a)(4) (ALJ need not proceed to the next step if s/he concludes that a claimant is not disabled at an earlier step).  In so doing, Fallis never argues or demonstrates that her alleged impairments "would have more than a minimal effect on [her] ability to do basic work activities," thereby requiring the ALJ to proceed to step three.

Even after Defendant pointed out the inadequacy of Fallis' opening arguments, she fails to address the critical issue in her reply brief.  Instead, counsel for Fallis sets forth assumptions and generalities, e.g., because Fallis was "fixed with screws, nails, and metal plates", "[t]his, in turn, is reasonably expected to result in the severe physical limitation to which she testified to at her hearing." [Fallis' reply, p. 1.]  Reasonable expectations, to the extent they exist here, do not amount to

15

evidence.  In addition, Fallis' argument that she should be "deemed disabled as per the Grids regulations" is unsupported and misplaced.  The ALJ did not reach the sequential step where application of the grids might be at issue.  If an impairment is found to be non-severe at step two, "by definition the impairment does not prevent the claimant from engaging in *any* substantial gainful activity."  <u>Yuckert</u>, 482 U.S. at 147 (emphasis added).

Finally, contrary to Fallis' position, the ALJ did take Fallis' age into consideration.  His decision expressly discussed her age and the fact that she was closely approaching retirement age [Tr. at 11], notwithstanding the fact that the ALJ was not required to do so.  "If a claimant is unable to show that he has a medically severe impairment, he is not eligible for disability benefits.  In such a case, there is no reason for the [Commissioner] to consider the claimant's age, education, and work experience."  <u>Yuckert</u>, 482 U.S. at 148.

## Conclusion

For all of the above-stated reasons, the Court concludes that substantial evidence supports the ALJ's decision, that the ALJ committed no legal error in reaching his conclusion, and that Fallis' motion to reverse or remand will be denied.

IT IS THEREFORE ORDERED that Fallis' Motion to Reverse Administrative Decision or, in the Alternative, a Remand of Said Decision [Doc. No. 6] be DENIED and that this matter be dismissed with prejudice.


_____
Lorenzo F. Garcia
Chief United States Magistrate Judge